FILED
2006 Jul-17  PM 12:02
U.S. DISTRICT COURT
N.D. OF ALABAMA



**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

06 JUL 17  AM 10: 42

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| LAUREL JULIAN, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | 2:04-cv-3285-JHH |
| BEVERLY ENTERPRISES – ALABAMA, INC., a corporation, | ) | |
| | ) | |
| DEFENDANT. | | |

## MEMORANDUM OF DECISION

The court has before it the May 1, 2006 motion (doc. # 51) of defendant
Beverly Enterprises - Alabama, Inc. ("Beverly") for summary judgment.  Pursuant
to the court's May 3, 2006 order, the motion was deemed submitted, without oral
argument, on June 7, 2006.

### I. Procedural History

Plaintiff Laurel Julian commenced this action on November 23, 2004 by
filing a complaint in this court alleging age discrimination in violation of the Age
Discrimination in Employment Act, as amended 29 U.S.C. § 621 et seq.  Plaintiff
contends that defendant terminated her because of her age.  Defendant's May 1,
2006 motion for summary judgment and brief in support of the motion assert that

plaintiff has failed to establish a prima face case for plaintiff's claim, and, in the alternative, plaintiff has failed to establish that the legitimate, nondiscriminatory reasons for her termination were a pretext for age discrimination.

Both parties have filed briefs and submitted evidence in support of their respective positions. On May 1, 2006, defendant submitted a brief (Attachment to doc. # 51 ) and evidence[1] (Exs. 1-5 to doc. # 51) in support of its own motion for summary judgment.  On May 31, 2006, plaintiff filed a brief and evidence[2] (doc. # 54) in opposition to defendant's motion for summary judgment.  On June 7, 2006, defendant filed a brief and evidence[3] (doc. # 56) in reply to plaintiff's opposition.

Before discussing the merits of the motion for summary judgment, the court must first address another pending motion.  Plaintiff filed a motion (doc. #55) to

---

[1] The defendant submitted the following evidence: excerpts and exhibits from deposition of Laurel Julian; excerpts of deposition of Keith Jewell; excerpts of deposition of Hope Hickman; excerpts of deposition of Bessie Mizelle; excerpts of deposition of Timothy Detary; and affidavit of Jayme L. Tucker dated April 28, 2006.

[2] The plaintiff submitted the following evidence: deposition of Laurel Julian; deposition of Hope Hickman; deposition of Keith Jewell; excerpts of notes of Laurel Julian; Beverly's discipline, supervisory and managerial associates; employee information sheet on Laurel Julian; employee information sheet on Katherine Ponder; plaintiff's first set of interrogatories and request for production; defendant's responses to plaintiff's interrogatories and request for production; declaration of Martha Williams; declaration of Glenda Burns; declaration of Shelby Walker; declaration of Mary Alice Edmonds; letter from defense counsel regarding Mike McKelvaine; score card summary; e-mail from Hope Hickman to Laurel Julian dated 3/18/2003; e-mail from Judy Pritchard to Laurel Julian dated 4/18/2003.

[3] The defendant submitted the following evidence: affidavit of Jayme L. Tucker dated June 7, 2006.

strike regarding four pieces of evidence submitted by defendant in support of its

motion for summary judgment.  Plaintiff contends that the court should strike the

following: (1) the January 2003 action plan; (2) the March 2003 state survey; (3) a

comment by an administrative law judge in an unfair labor practices case against

Beverly regarding plaintiff; and (4) the hotline complaints.  Plaintiff argues that

defendant should not be allowed to use this evidence as justification for her

termination because they were not disclosed as a part of defendant's initial

disclosures under Rule 26(a) and because they were not disclosed in response to

plaintiff's interrogatories and requests for production regarding the reasons for her

termination.

The motion is due to be denied.  The court has already dealt with three of

the pieces of evidence (the survey, ALJ decision, and hotline complaints), in

plaintiff's motion for sanctions, which the court deemed borderline frivolous.  The

court will not restate the reasons for allowing defendant to use this evidence, but

instead, directs the parties to its March 29, 2006 order (doc. # 50).  As for the

action plan, the court first notes that there is nothing to strike.  Defendant did not

submit the action plan as evidence, but instead plaintiff testified regarding the

action plan in her deposition.  Second, there seems to be no dispute that Julian was

placed on an action plan in January 2003.  As such, that fact is properly before the

3

court.   Moreover, the court disagrees with plaintiff's characterization of this

evidence as a justification for plaintiff's termination.   Instead, the court views this

evidence as facts surrounding and indicative of her performance problems, which

ultimately led to her termination.   In addition, that the defendant allegedly did not

inform plaintiff of all the reasons for her termination do not make those reasons

any less legitimate if they actually occurred.   There is no dispute of fact as to

whether these incidents occurred.   For the above reasons, plaintiff's motion (doc.

#55) to strike is **DENIED**.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229

F.3d 1012, 1023 (11th Cir. 2000).   The party asking for summary judgment always

bears the initial responsibility of informing the court of the basis for its motion and

identifying those portions of the pleadings or filings which it believes demonstrate

the absence of a genuine issue of material fact.   See id. at 323.   Once the moving

party has met its burden, Rule 56(e) requires the nonmoving party to go beyond

4

the pleadings and by its own affidavits, or by the depositions, answers to
interrogatories, and admissions on file, designate specific facts showing that there
is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are
irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All
reasonable doubts about the facts and all justifiable inferences are resolved in
favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115
(11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable
jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.
If the evidence is merely colorable, or is not significantly probative, summary
judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge
its initial burden depends on whether that party bears the burden of proof on the
issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four
Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving
party bears the burden of proof at trial, then it can only meet its initial burden on
summary judgment by coming forward with positive evidence demonstrating the
absence of a genuine issue of material fact; i.e. facts that would entitle it to a
directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once

5

the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. See Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the

6

movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[4]

Beverly is engaged in the business of long-term care for the elderly and sick.  (Pl. Dep. at 23-24.)  Julian served as the Executive Director of Beverly's licensed skilled nursing facility in Oneonta, Alabama, for approximately 28 years.  (Id. at 19, 24, 36-37.)  As Executive Director, Julian had overall management responsibility for the entire facility.  (Id. at 38.)  She was responsible for budget preparation and compliance, human resource issues, census building,[5] compliance with state and federal regulations, maintenance and development of positive relationships with government regulators, residents, families and the greater community, and oversight of Medicare and Medicaid billing and reimbursement.

---

[4] If the facts are in dispute, they are stated in a manner most favorable to the non-movant. See Fitzpatrick, 2 F.3d at 1115.

[5] Census building means maintaining a sufficient number of residents in the facility.  (Pl. Dep. at 41.)

(Id. at 38-41, 45-46, 55-56.)  She was responsible for staff recruitment, retention, training, and morale.  (Id. at 39, 47.)  Julian also ensured that the needs of the residents were addressed.  (Id. at 47.)

## A.  January 2003 Action Plan

In October 2002, Beverly conducted an Internal Quality Review of the Oneonta facility.  (Id. at 82-83.)  The review revealed some deficiencies, and Julian was directed to correct the problems.  (Id. at 81, 83.)  In December 2002, Beverly conducted a Quality Review follow up and discovered that the problems at the facility had not been corrected and noted additional problems.  (Id. at 81, 83-84.)  As a result of the problems, Julian was placed on an action plan in January 2003.  (Id. at 91-92.)  Julian understood that Beverly considered the issues as serious ones.  (Id. at 93-95.)  Julian then placed three of her senior staff members, those in charge of the areas with the serious deficiencies, on action plans.  (Id. at 85-91.)

## B.  March 2003 Immediate Jeopardy Tag

A couple of months later, in March 2003, the state of Alabama conducted a survey to ensure that the facility was complying with regulations.[6]  (Id. at 104.)

_____

[6] All skilled nursing facilities are subjected to state and federal operating regulations under Medicare and Medicaid.  (Pl. Dep. at 170.)  The state of Alabama conducts these surveys annually or in response to a complaint.  (Id. at 171.)

8

The survey identified numerous deficiencies and resulted an "Immediate Jeopardy" tag. (<u>Id.</u> at 104-05.) This tag was the worst rating the facility could receive; the state explicitly determined that the facility's "failures placed the one hundred and fourteen current residents in the facility in immediate and serious threat of harm, injury, impairment, or death." (<u>Id.</u>; Ex. 9 to Pl. Dep. at 8.) Until the tag was removed, new residents were not allowed in the facility. (Pl. Dep. at 105.) It also placed the facility in jeopardy of losing funding from Medicaid and Medicare, which would have forced the facility to close. (<u>Id.</u> at 106.)

As a result of the immediate jeopardy tag, the facility received a statement of deficiency from the state surveying agency. (<u>Id.</u> at 167; Ex. 9 to Pl. Dep.) The findings included actual harm and abuse of the residents. (Pl. Dep. at 104, 188-89.) In addition, Julian, as the administrator of the facility, received an immediate jeopardy tag. (<u>Id.</u> at 189.) The surveyors determined that "the facility's Executive Director failed to ensure systems were in place for staff to timely report, thoroughly investigate, and provide for the resident safety to ensure that residents were safe and free from abuse. This had the potential to affect all 114 residents in the facility." (Ex. 9 to Pl. Dep. at 21.) This tag placed Julian's license at risk, and she was required to appear before the State of Alabama Board of Examiners of Nursing Home Administrators; no action was taken against Julian by the state

9

board.[7] (Pl. Dep. at 194-95; Ex. 11 to Pl. Dep.)

In an attempt to lift the immediate jeopardy tag as soon as possible, the facility implemented a correction plan that very day and began significant retraining of the employees, including Julian and her management staff. (Pl. Dep. at 168-69.) The immediate jeopardy tag was removed after four days. (Hickman Dep. at 79-80; Pl. Dep. at 290.) The facility did not lose and Medicare funds during those four days. (Id.) One patient was removed from the facility, admitted to the hospital during this time, and was not readmitted to Beverly, but not as a result of the immediate jeopardy tag. (Id.)

### C.  Other Problems

Julian experienced other problems as Executive Director of the Oneonta facility. One of those problems was a fairly severe staffing shortage from the middle of 2002 into 2003. (Pl. Dep. at 75.) Julian admitted that the facility had a difficult time recruiting and retaining nurses. (Id.) For example, in May 2003, there were eight certified nursing assistant openings. (Id. at 158; Ex. 7 to Pl. Dep.) Also that month, Julian informed her supervisor, Director of Operations, Hope Hickman, that she was not going to be able to cover the schedule for licensed

---

[7] Julian disagreed with the results of the survey and was appealing the findings. (Pl. Dep. at 176; Hickman Dep. at 117.) Beverly chose not to pursue an appeal of the findings, even though they had appealed other findings in the past. (Pl. Dep. at 177; Hickman Dep. at 118.)

nurses for three days.  (Id. at 152.)  Julian informed Hickman that the staffing

"look[ed] very dicey" and testified that the staffing shortage had become critical.

(Id. at 159-60; Ex. 7 to Pl. Dep.)

Julian testified that she believed that the problem with recruitment and

retention was because the facility was not competitive in the wages that it paid.

(Pl. Dep. at 272-73.)  Julian told Hickman that this was her belief on several

occasions.  (Hickman Dep. at 136.)  In 1999, Julian requested a wage increase that

was approved in March 2000, but Julian testified that the increase was insufficient

and that the facility's wages remained below that of other facilities.  (Pl. Dep. at

273-77.)  Julian also alleges that in 2003, other facilities in the area had similar

retention and recruitment problems.  (Ex. 16 to Pl. Dep.)

Another problem revolved around deficiencies in the medical records

documentation at the facility.  (Pl. Dep. at 69.)  Julian testified that the

administrative nurses were not keeping up with the documentation that needed to

be completed and filed with Medicare, for example.  (Id. at 70-71.)  Without

completion of that paperwork, Beverly could not submit claims for Medicare

payment.  (Id. at 71-74.)  Julian admitted that these deficiencies were serious

problems within the facility.  (Id. at 74.)

An additional area where Julian experienced difficulty as Executive

11

Director was with maintenance of the patient census.  (Pl. Dep. at 68, 75-76, 221, 227; Ex. 12 to Pl. Dep.; Hickman Dep. at 60, 77-79, 149-50.)  In March 2003, after the immediate jeopardy tag, the facility census dropped and continued below budget throughout the remainder of Julian's employment.  (Hickman Dep. at 79.) Hickman questioned Julian about the drop in mid-April 2003.  (Ex. 12 to Pl. Dep.) Julian responded by stating the following reasons for the drop in the census: (1) that there had been more deaths of patients that year due to the admission of "a lot of higher acuity patients"; (2) that because they "marketed for short-term rehab admissions," many patients had been discharged and returned home; and (3) several negative rumors in the community regarding the facility.  (Id.)  Julian also pointed out that the previous April had also marked a low point in the census. (Id.)  In addition, she told Hickman that she planned an open house to dispel the rumors, had "extended [the] marketing radius" to other hospitals and medical facilities, and was "looking for more traditional long-term admissions to stabilize [the] census."  (Id.)

Julian also experienced problems in the form of hot line complaints against her.  Beverly maintains a confidential hotline that is available for residents, families and employees to report any problems or issues that may exist.  (Pl. Dep. at 229.)  On January 20, 2003, Beverly received a complaint from a daughter of a

resident who complained that Julian had been rude to her on several occasions. (Ex. 15 to Pl. Dep.)  She stated the Julian treated family members like "they are not important" and did not "resolve and address concerns."  (Id.)  She also complained about the lack of staffing.  (Id.)  Hickman investigated the complaint, but could not verify the complaint because the caller did not reveal her identity. (Hickman Dep. at 165.)

On March 24, 2003, another family member of a resident called the hotline and complained about the lack of adequate staffing.  (Ex. 15 to Pl. Dep.)  She stated that she had attempted to speak with Julian on eight occasions, but was turned down each time.  (Id.)  She remarked that she heard Julian tell her assistant to "tell them I can't right now" or "I'm busy, maybe later."  (Id.)  When Hickman questioned Julian regarding the complaint, Julian admitted that the facility was understaffed, but that other nurses were working overtime to compensate.  (Id.) She also told Hickman that she only turned away family members when she was in a meeting or on a conference call.  (Id.; Pl. Dep. at 238-39.)

One more issue plagued Julian in her final years as Executive Director: union organization.  In July 2000, the Food and Commercial Workers Union filed a representation petition with the National Labor Relations Board (NLRB) to become the representative of the non-management employees at the facility.  (Pl.

13

Dep. at 127-28.)  Beverly conducted a campaign against union organization, with Julian leading the effort to respond to the union's petition.  (Id. at 130.)

The NLRB conducted an election on September 7, 2000.  (Id. at 130-31.) Although Beverly won the election, the union filed objections to the election and several unfair labor practice charges with the NLRB, including one against Julian. (Id. at 131.)  After the NLRB investigated, it issued a complaint against the facility, and set the case for a trial.  (Ex. 4 to Pl. Dep.)  In preparation for the trial, Keith Jewell, the General Counsel for Labor and Employment, visited the facility. (Jewell Dep. at 22.)  Jewell testified that during this visit a number of employees complained about Julian's management style and indicated that she had a poor relationship with her subordinates.  (Id.)  He also testified that these employees reported that Julian would not associate with them, did not listen to them, was not appreciative or them, and that they needed assistance.  (Id.)

Jewell related his conversations with these employees to Katie Johnston, Julian's supervisor at the time.  (Id. at 24.)  Jewell recommended that Johnston become more involved with the facility to improve employee relationships and morale, especially because he believed there would be another election after the NLRB trial.  (Id. at 24-25, 28.)  Jewell also informed others of his belief that the facility would not win another election because of Julian's poor relationship with

14

her employees.  (Id. at 26-28; Detary Dep. at 30, 42-43.)

The case proceeded to trial, where the administrative law judge ordered a
new election, finding several violations of labor law.  (Pl. Dep. at 135-36, 140; Ex.
4 to Pl. Dep. at 30.)  The ALJ found the specific charge against Julian to be
unsubstantiated, however, and dismissed that charge.  (Pl. Dep. at 135; Ex. 4 to Pl.
Dep. at 18.)

### D. Julian's Termination

In mid-May 2003, Hickman informed Julian that a group of people from the
regional office would be coming to her facility on May 16, 2003.  (Pl. Dep. at
216.)  The group included Hickman, the Regional Vice President, Chris Landers,
the Senior Professional Service Consultant for Alabama, Jenny Scott, a Medicare
Payment Specialist, Trish Carruth, the Regional Environmental Specialist, Bessie
Mizelle, and a Professional Service Consultant, Melanie Burch.  (Id. at 217.)  The
group was visiting the facility to evaluate its performance regarding progress made
since the state survey, census potentials, recruitment and retention issues, and
Medicare documentation.  (Hickman Dep. at 53.)

On the morning of May 16, 2003, the group began their evaluation with a
tour of the facility.  (Pl. Dep. at 249; Hickman Dep. at 55.)  The consultants left
the tour to evaluate each of their respective areas, but Hickman and Landers

15

continued their tour of the facility.  (Hickman Dep. at 55.)  The tour was generally

uneventful, although they did see items in the shower room that were not supposed

to be there.  (Id. at 55-56.)  Hickman and Landers informed Julian of the situation

and she had the shower room cleaned.  (Id. at 56.)  The consultants then rejoined

Hickman and Landers, and the group discussed issues with staffing, which was

low but met minimum requirements, and issues regarding the census.  (Id. at 57.)

The group then left the facility and went to lunch.  (Id. at 59.)  While at

lunch, they talked about the findings in the various departments.  (Id. at 60.)  The

discussion centered on the overall problems of staffing, the census, and Medicare

documentation.  (Id. at 60-61.)  The consensus was that the facility was not

making progress.  (Id. at 61.)  Landers asked Hickman what she was going to do

about the situation, and Hickman stated that she needed to terminate Julian and

begin anew with another administration head.  (Id. at 61-62.)  Hickman testified

that she did not consider any other alternatives to termination, considering the

staffing issues, immediate jeopardy tag, census problems, "NLRB decision

hanging over [their] heads," and the other action plan.  (Id. at 63.)  She "just felt

like it was because of all those thing and they weren't – we weren't seeing any

improvements that [termination] was the only alternative."  (Id.)

After lunch Hickman and Jenny Scott met with Julian in Julian's office.

(Id.; Pl. Dep. at 66.)  Hickman informed Julian that "it had not been a good visit, it had not been a good year, and that the [employment] relationship was being severed." (Pl. Dep. at 66.)  Julian asked why she was being terminated, and Hickman told her that "the census was below budget, [the facility] was unable to recruit and retain staff, and things were getting behind." (Id. at 67.)  Julian told Hickman "that it was not a fair assessment," left her keys on the desk, picked up her purse, and left the facility.  (Id. at 68.)  Julian rejected the severance package offered by Beverly.  (Id. at 67; Detary Dep. at 36; Ex. 1 to Detary Dep.)

### E. Julian's Replacement

After Julian's termination, at the suggestion of Landers, Hickman approached Katie Johnston, Julian's former supervisor, and asked that she come out of retirement to temporarily replace Julian as Executive Director of the Oneonta facility.  (Pl. Dep. at 22-25.)  Johnston agreed and began work a week later on May 23, 2003.  (Tucker Aff. ¶ 3.)  Johnston was 67 years old at the time. (Id.)  Two weeks later, on June 6, 2003, Kitty Ponder transferred from the facility in Pell City, Alabama, and replaced Johnston as Executive Director.  (Id.)  Ponder was 56 at the time of the transfer.  (Id.)

### IV. Applicable Substantive Law

The analysis of the plaintiff's claims will be determined not only by the

17

nature of the allegations but also by the quality of the evidence offered in support of those claims.  See Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) ("[t]he analytical framework and burden of production var[y] depending on the method of proof chosen").  In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999).  A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is "[s]uch evidence [which], if believed, proves the existence of a fact in issue without inference or presumption."  Burns v. Gadsden State Community College, 908 F.2d 1512 (11th Cir. 1990).  Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition); see also Bass v. Board of County Commissioners, Orange County,

18

<u>Florida</u>, 242 F.3d 996, 1010 (11th Cir. 2001) (discussing meaning of "direct evidence" in the context of a Title VII race discrimination claim; "direct evidence" refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination.").

Here, it is undisputed that plaintiff has presented only circumstantial evidence of age discrimination. "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." <u>Combs</u>, 106 F.3d at 1527.  Under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  <u>See id.</u> at 1527-28.  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation. <u>See, e.g.</u>, <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1185 (11th Cir. 1984); <u>Lincoln v. Board of Regents of Univ. Sys.</u>, 697 F.2d 928, 937 (11th Cir. 1983).  In general, a plaintiff establishes a prima facie case of disparate

treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[8] See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

After the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[9] See Rojas, 285 F.3d at 1342; Combs, 106 F.3d at 1528. The employer "need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024. If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence

---

[8] See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

[9] See Chapman, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[10]  Where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  See Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at. 253.  Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered

---

[10] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

21

legitimate reasons, thus permitting but not compelling the trier of fact to make a

finding of illegal discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc.,

530 U.S. 133, 147-48 (2000) (pointing out that the production of the necessary

sufficient evidence by plaintiff will not always prevent the employer from

prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's

prima facie case, the probative value of the proof that the employer's explanation

is false, and any other properly considered evidence that supports the employer's

case are among other factors to take into account in evaluating a Rule 50

motion);[11] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly,

210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d

1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and

the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-

21 (11th Cir. 1993).

## V.  Discussion

Plaintiff's complaint alleges that defendant terminated her because of her

age, in violation of the ADEA.  Defendant's motion for summary judgment asserts

that plaintiff has failed to establish a prima face case for plaintiff's claim against

---

[11] The court in Chapman modified the statement in Combs contrary to this holding in
Reeves after noting that the standard for granting summary judgment mirrors the standard for
judgment as a matter of law.  See Chapman, 229 F.3d at 1025, n.11.

defendant.  Even if she did establish a prima facie case, defendant argues that plaintiff has failed to rebut its legitimate, nondiscriminatory reasons for her termination.  As such, defendant contends it is entitled to summary judgment on plaintiff's complaint.

### A. Prima Facie Case

The ADEA makes it "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  As outlined in detail above, the Eleventh Circuit uses the framework established in McDonnell Douglas and Burdine to evaluate ADEA claims that are based upon circumstantial evidence of discrimination.  Chapman, 229 F.3d at 1024 (citations omitted).  Under that framework, the plaintiff must first establish a prima facie case of discrimination. See Combs, 106 F.3d at 1527-28 (citations omitted).  One method a plaintiff can use to establish a prima facie case for an ADEA violation is by showing that she (1) was a member of the protected age group, (2) was subjected to adverse employment action, (3) was qualified to do the job, and (4) was replaced by or otherwise lost a position to a younger individual.  Benson v. Tocco, Inc., 113 F.3d 1203, 1207-08 (11th Cir. 1997).

23

The first three elements of her prima facie case are undisputed: she is a member of the protected class at the age of 64; she was subjected to an adverse employment action, termination; and she was qualified to do the job.  Defendant contends, however, that Julian failed to establish the fourth element of her prima facie case because Julian's immediate replacement, Katie Johnston, was 67 years old, or three years older than Julian.  In addition, Beverly argues that Johnston's replacement, Kitty Ponder, who was 56 at the time of her transfer to Julian's former position, was not substantially younger than Julian.

Julian admits that her immediate replacement was older than she.  However, Julian argues that the court should not apply a rigid test under <u>McDonnell Douglas</u>; instead, because of the nature of age discrimination claims, Julian contends that the court should allow more flexibility in the presentation of her prima facie case.

The Eleventh Circuit has warned about the strict application of the prima facie case in situations similar to the one presented here:

> A mechanistic application of the <u>McDonnell</u> prima facie test is especially dangerous in the context of age discrimination. Seldom will a sixty-year-old be replaced by a person in the twenties. Rather the sixty-year-old will be replaced by a fifty-five-year-old, who, in turn, is succeeded by a person in the forties, who also will be replaced by a younger person. Eventually, a person outside the protected class will be elevated but rarely to the position of the one fired. <u>McCorstin</u>

v. United States Steel Corp., 621 F.2d 749, 754 (5th Cir. 1980).

Pace v. Southern Ry. System, 701 F.2d 1383, 1387 (11th Cir. 1983).  Keeping in mind the directives from the Eleventh Circuit, the court agrees with Julian regarding her replacement.  Although Johnston may have immediately assumed Julian's position, Johnston did not actually replace Julian; she was only a temporary replacement.  Johnston came out of retirement for a short, two-week period to run the facility while Beverly found a permanent replacement.  The court would not be faithful to the spirit of the law if it were to accept Beverly's argument that Johnston actually replaced Julian.  Instead, the court finds that Julian's permanent replacement was Ponder.

Anticipating this conclusion, Beverly argues that Julian still did not establish a prima facie case because  Ponder was not "substantially younger" than Julian.  The court disagrees.  Ponder was born on May 11, 1947, and was 56 at the time she replaced Julian.  (See Ponder Employee Information Sheet; Tucker Aff. ¶ 3.)  Julian was 64 at the time of her termination.  The Eleventh Circuit has held that a replacement who was only five years younger was sufficient to establish a prima facie case.  Damon v. Fleming Supermarkets of Fla, 196 F.3d 1354, 1360 (11th Cir. 1999).  Here, there is a eight year age difference between Julian and Ponder.  As such, Julian established a prima facie case of age discrimination.

25

### B. *Legitimate, Nondiscriminatory Reasons for Termination*

Beverly articulated multiple reasons for Julian's termination, including, but not limited to, recruitment and retention problems, employee morale problems, documentation deficiencies, census problems, and receipt of an immediate jeopardy tag on a state survey. (Hickman Dep. at 42, 63.)   The sum of all the specific reasons is that Beverly terminated Julian for unsatisfactory work performance. (Id.)  Julian herself testified that the facility, of which she was Executive Director, had serious problems and was not performing satisfactorily. (Pl. Dep. at 68-75, 99-100, 104-06, 148-52, 158-60, 167-69, 188-89, 205, 221.) Beverly, therefore, satisfied its burden of production under McDonnell Douglas.

### C. *Pretext*

Julian has failed to produce evidence sufficient for a reasonable jury to conclude that the employer's legitimate, nondiscriminatory reasons for her termination were a pretext for age discrimination.  See Chapman, 229 F.3d at 1025 n.11.  The bulk of Julian's arguments regarding pretext boil down to explanations and excuses for her and the facility's poor performance in the last months of her employment.  Such arguments do not come close to establishing pretext in the Eleventh Circuit.  "A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by" age.

26

Lee, 226 F.3d at 1253.  The role of the court "is to prevent unlawful hiring practices, not to act as a super personnel department that second-guesses employers' business judgments."  Id. at 1254.  The court's "sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."  Damon, 196 F.3d at 1361. Whether the poor performance was Julian's fault is not an issue for the court to consider.

Julian's four remaining arguments regarding pretext are equally unavailing. First, Julian cites the March 2000 wage increase as evidence of age discrimination in her termination.  The court is baffled by this argument.  Julian does not make any logical link between the alleged age discrimination in May 2003, and a wage increase for nurses three years earlier.  Age had nothing to do with the wage increase, and the increase had nothing to do with Julian's termination. As such, the existence of the increase does not support Julian's claim of age discrimination.

Second, Julian contends that the alleged forced resignation of Mary Alice Edmonds in May 2003 supports Julian's claim that she was terminated because of her age.  Edmond's declaration falls short of providing Julian with evidence of pretext in her termination.  Although Edmonds testified that she was forced to resign at the age of 67 and was replaced by a woman in her fifties, she does not allege any sort of age discrimination in her resignation.  (Edmonds Decl. ¶¶ 3-4.)

27

That both she and Julian were replaced by someone younger does not establish a pattern of age discrimination.  In addition, the bare-bones declaration does not provide the court with nearly enough information to adequately compare the situations with Julian's facility to the one run by Edmonds.  Edmonds's declaration does not aid Julian in any way in establishing her burden that her termination was because of age discrimination.

Third, Beverly's termination policy does not establish that Julian was terminated because of her age.  Julian contends that Beverly violated its policy regarding her termination and that these violations are evidence of age discrimination.  Julian points to paragraph C of the policy that requires alleged misconduct to be investigated before termination and contends that because no such investigation occurred, Beverly violated its policy when it terminated her. This argument misses the mark.  Julian was not terminated for misconduct; she was terminated for unsatisfactory performance.  As such, paragraph C of Beverly's policy regarding misconduct is completely irrelevant.

Finally, that Hickman did not inform Julian of all the reasons for her termination in no way permits a trier of fact to infer that she was terminated because of her age.  See Tidwell v. Carter Prods., 135 F.3d 1422, 1428 ("at most, the jury could find that [plaintiff's] performance was an additional, but

28

undisclosed, reason for the [termination] decision; the existence of a possible

additional non-discriminatory basis for the plaintiff's termination does not,

however, prove pretext.").  Moreover, Julian does not allege that the reasons were

false; instead she repeatedly admitted in her deposition that all of the problems

existed at the time of her termination.  As such, this final effort by Julian to

establish pretext also fails.

Julian has not offered any evidence that her termination was because of her

age.  Although she did establish a prima facie case of age discrimination, Julian

failed to produce evidence sufficient for a reasonable jury to conclude that

Beverly's legitimate, nondiscriminatory reasons for her termination were a pretext

for age discrimination.  As such, summary judgment is due to be granted in favor

of Beverly.

## VI. Conclusion

In summary, the court finds that no material issues of fact remain and that

defendant Beverly Enterprises - Alabama, Inc. is entitled to judgment as a matter

of law as to all claims asserted by plaintiff.

A separate order will be entered.

**DONE** this the ___17th___ day of July, 2006.

_____
SENIOR UNITED STATES DISTRICT JUDGE